IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
CINCINATTI , OHIO

YUSUF BROWN-AUSTIN,  
C/O THE LAW OFFICE OF ERIC ALLEN, LTD  
4200 Regent, Suite 200  
Columbus, Ohio 43219  

Case Number

Judge

Magistrate

        Plaintiff,

v.

ANNETTE CHAMBERS-SMITH  
DIRECTOR, OHIO DEPARTMENT OF REHABILITATION AND CORRECTIONS  
IN HER INDIVIDUAL AND PROFESSIONAL CAPACITY  
4545 Fisher Road, Suite D,  
Columbus, OH 43228  

AND

CHIEF INSPECTOR CHRIS LAMBERT  
IN HIS INDIVIDUAL AND PROFESSIONAL CAPACITY  
4545 Fishers Road  
Columbus, Ohio 43228  

AND

DOUG FENDER, WARDEN OF NORTHEASTERN CORRECTIONAL  
IN HIS PERSONAL AND PROFESSIONAL CAPACITY  
2240 Hubbard Rd  
Youngstown, OH 44505  

AND

DEPUTY WARDEN  
2240 Hubbard  
Youngstown, Oh 44505  

AND

UNIT MANAGER DOUGLASS  
IN HER PERSONAL AND PROFESSIONAL CAPACITY  
2240 Hubbard  
Youngstown, Ohio 44505  

1

AND

ASSISTANT INVESTIGATOR WYMAN
IN HIS PERSONAL AND PROFESSIONAL CAPACITY
2240 Hubbard
Youngstown, Ohio 44505

CORE CIVIC CORPORATION
5501 Virginia Way, Suite 110
Brentwood, TN 37027

        Defendants,

## VERIFIED COMPLAINT FOR RELIEF UNDER 42 U.S.C. 1983

### TRIAL BY JURY DEMANDED

### INTRODUCTION

1. Plaintiff Yusuf Brown-Austin is an individual who is incarcerated for a series of crimes, including murder, for Stark County, Ohio. He is a gang member and belongs to the Crips. This affiliation affords him protection from other violent gang members and brutal correctional institution staff.

2. Plaintiff was sent to Northeastern Ohio Correctional Center (hereinafter NEOCC) in 2017. This was operated by Defendant CORE.

3. CORE is a for-profit corporation headquartered in Tennessee. It has been the target of numerous lawsuits claiming that understaffing is a constant problem. A report by the comptroller of Tennessee found that CORE frequently understaffs its prisons to maximize its profits. ODRC is aware of this fact yet continues to contract with CORE CIVIC.

2

4. During this time, Defendant CORE had not sufficiently staffed this institution. There were not enough guards to control and regulate the prisoners. This was an attempt to maximize profits and reduce costs. Plaintiff was approached by the Deputy Warden as well as other high-ranking gang members at the prison. Deputy warden promised the gang leaders free reign of the prison if they would regulate the prisoners. These gangs were charged with keeping the peace in the institution. This allowed the warden and ultimately CORE to maximize profits by understaffing the prison. This regulation included carrying out discipline and deciding who gets what jobs.

5. In June 2022, a gun was brought in as contraband and delivered to another gang. The allegation is that someone flew a drone near the prison and dropped it in the yard. Warden requested that Plaintiff go to the gang members and get the gun back. Plaintiff, not wanting to be killed, refused. He was then thrown into solitary confinement. He was released from solitary on July 11, 2022, and rode out to Southern Ohio Correctional Facility.

## JURISDICTION

6. This Court has jurisdiction of the action under 28 U.S.C. §§ 1331 and 1343. This action arises under the Fourteenth Amendment to the United States Constitution, and under federal laws, 42 U.S.C. §§ 1981, and 1983.

## VENUE

7. Venue in this Court is proper under 28 U.S.C. § 1391 and this court has personal jurisdiction over the defendants sued in their personal capacities in this matter because the events giving rise to this claim occurred in this district.

## PARTIES

8. Plaintiff is a resident of Ohio and lives within the Western Division of the Southern District of Ohio. He is incarcerated for convictions from Stark County, Ohio.

9. Defendant Smith is the Director of the Ohio Department of Corrections and Rehabilitation (hereinafter ODRC). She oversees all matters involving ODRC. She is being sued in her personal and professional capacity. She is responsible for making contracts with outside agencies and corporations.

10. Defendant Lambert is the Chief Inspector at ODRC. He is responsible for answering all grievances made by prisoners within ODRC. He is being sued in his personal and professional capacity.

11. Defendant Bender is the Warden at NEOCC in Youngstown, Ohio. He is responsible for the day-to-day operations of the prison.

12. Defendant Deputy Warden works at the NEOCC in Youngstown, Ohio. He is responsible for carrying out the orders of Defendant Bender.

13. Defendant Douglass is a Unit Manager at NEOCC. He is responsible for the day-to-day affairs of the prisoners in his Unit.

14. Defendant Wyman is an investigator at NEOCC. He is responsible for investigating crimes at the institution.

15. Defendant CORE CIVIC is a Tennessee Corporation with main offices in Brentwood, TN. It is a multi-national corporation that runs private prisons throughout North America. It has conducted business in Ohio and signed a contract to run NEOCC.

4

## ALLEGATIONS OF FACT

16. Plaintiff was transferred to NEOCC in 2017. After about five to seven months of being there was a meeting with then warden Larsose, Assistant Warden Hurst and Chief of Security Vintell. Also present at that meeting was the Plaintiff and four to five other inmates considered to be gang leaders. The gangs that are at NEOCC are the Heartless Felons, the Crips, and the Gangster Disciples. The warden, assistant warden and Chief of security indicated that if the inmates present helped to control the inmate population by keeping violence down, they would allow the gangs to control the prison. The staff indicated they needed to keep the level of violence near the amount they reported to the Ohio Department of Corrections to keep the contract. This arrangement was kept in place even with a change in leadership. Each new warden and assistant warden would reiterate this arrangement with the Plaintiff and other gang members.

17. NEOCC had roughly nine hundred inmates. Plaintiff alleges that during many shifts there were NO guards working at all in the prison. Most of the time there were less than 10 guards for the entire state side of the prison. When there were guards there were so few, they could not possibly control all the inmates. The warden and his staff relied on inmates to keep the peace.

    a. The Leavenworth Detention Center in Kansas was similarly understaffed. A vacancy rate audit done in 2017 found it was 25% filled with guards. This is also run by CORE CIVIC.

  b. The Trousdale Turner Correctional Center in Tennessee was also found to be dangerously understaffed. This prison is also run by CORE CIVIC.

  c. A Tennessee Comptroller audit found that prisons run by CORE CIVIC to be dangerously understaffed. A recommendation of the report was that CORE CIVIC be required to show true and accurate staffing numbers as required by the contract. If they did not, they would have to pay the state of Tennessee.

  d. Staffing has been a constant issue at NEOCC because of the low pay.

  e. In 2022, Defendant CORE CIVIC settled a lawsuit for an undisclosed amount that alleged chronic understaffing at a Tennessee prison.

18. NEOCC guards are also bringing in dangerous contraband. On December 15, of 2022, a guard plead guilty to federal charges of smuggling in drugs to the inmate. *U.S.A. v Terrigno, 22 CR 640.* On March 25, 2021, another guard plead guilty to bribery charges related to bringing in contraband to NEOCC. *U.S.A v Herring 22 CR 436.* These are only the guards that were indicted by the federal government.

19. This environment led the prison staff and administrators to make this unusual agreement with the gang leaders of NEOCC.

20. Plaintiff was ordered by prison staff to fight with other prisoners who had taken property of inmates. They were to retrieve property and if given any resistance beat the inmates. Inmates that assisted Plaintiff were Travis Addy, Ty Kremling

and Kurtis Williams. All these incidents were at the order of guards or staff working for Northeast Correctional Center. The only time Plaintiff would act was if he was told by an employee of the prison to retrieve property.

    a. In 2022, inmates broke into the school area and stole several computers. Plaintiff was approached by Chief of Security Cogner and Assistant Investigator Wyman and told they needed it back. Plaintiff received the computers at physical risk and damage to himself. He was given a Sega Genesis for this behavior.

    b. Also in 2022, an elderly inmate was in the hospital and property was stolen by two inmates. D Unit Manager Douglass instructed Plaintiff to retrieve these items. Plaintiff and others retrieved the property and one of the inmates who stole it suffered a broken jaw. That inmate's family called complaining. Plaintiff was told to tell that inmate to tell his family to quit calling the prison. Plaintiff was told by the unit manager that the prison administration was very happy with how things were handled.

    c. Again in 2022, Plaintiff was ordered by Unit Manager Douglass to physically assault an inmate who had stolen their lunch. Plaintiff did so and was rewarded.

21. Plaintiff was ordered by prison staff to have people send pictures of state identification to his Jpay email account so that they could be approved as visitors off the books. He would then house those identification cards in his cell. This identification includes social security cards and birth certificates. The visitors

would be approved tentatively by either case manager Keenan or unit manager Viars. All that information was housed in Plaintiff's cell, at the administration's request, at Northeastern Correctional Center. When he was placed in local control for investigation, the guards allowed other inmates to take these identification pictures. All the identification was stolen when he was put in local control for the investigation in July 2022. It is possible that the private identifying information is being sold and traded within NEOCC.

22. Plaintiff was ordered by prison staff to run the visiting room. There were no guards present during the visits. During visiting times family members and significant others of inmates would bring in contraband. Inmates further would engage in sexual relations in the bathroom during visits without any guard supervision. In 2019, it was discovered that a drug dealer was directing distribution of his empire from NEOCC with a contraband cell phone. *U.S.A v Loranzao*

23. Plaintiff was allowed to enter the female only side of the prison but only did so once and did not have any sexual relations with the female prisoners. All the other gang leaders routinely would enter the female only side of the prison for sexual activity. Plaintiff cannot allege whether these encounters were consensual. At some point during his stay, the female prisoners were removed from Northeastern Correctional Center. The federal prisoners being held for Federal criminal and immigration charges have also been removed from Northeastern Correctional Center.

      a. At NEOCC, a contract employee was convicted for having sex with an inmate in 2021. *U.S.A v Davis*, 22 CR 829

24. Plaintiff oversaw hiring and firing inmates for jobs while at the prison. This was done with the understanding and approval of the administration of Northeastern Ohio Correctional Center. He was also allowed to remove individuals who had been transferred to other prisons for wrongdoing. He did this on several occasions for inmates who worked for him both in the visiting room and as his group of enforcers.

25. Plaintiff was responsible for helping new guards and staff understand how things worked at NEOCC. Assistant Warden Blackmon was unaware of the understanding when he came to the prison in 2022. He wrote up Plaintiff and fired him as the porter in the visiting room. Warden Bobby not only made the assistant apologize to Plaintiff, but he made Blackmon serve him a cheeseburger at the staff picnic. In front of all the staff at NEOCC.

26. On June,2022, a guard brought a loaded gun into the prison. A member of another gang retrieved the gun and brought it to the cell block. The administration found out this occurred and ordered Plaintiff to retrieve this weapon from the gang member. Plaintiff refused.

27. Also, in June inmate Richard Rodriguez was assaulted by fellow members of the Heartless Felons. This occurred in Plaintiffs "block." He told Rodriguez he would not allow them to kill him but ultimately this was between he and them. The administration claimed that he assaulted another inmate. The video of this alleged incident shows Plaintiff standing by and not assaulting the inmate.

Rodriguez wrote a statement saying that Plaintiff had nothing to do with the assault. A captain viewed the video and placed Plaintiff in local control.

28. Plaintiff was placed into local control on July 11, 2022. He was told that he was under investigation. He was also told by the defendants that he had nothing to worry about and that the administration would straighten out this captain.

29. After he was placed into segregation, Plaintiff's brother called the Ohio State Highway Patrol and told them that there was a gun in the prison and that the administration ordered Plaintiff to retrieve this gun. This angered all the Defendants as an outside agency had been made aware of the highly dangerous situation in the Prison.

30. All the Defendants became angry with the Plaintiff as he could, " not be trusted," according to Defendant Warden.

31. Plaintiff was transferred on the order of Warden David Bobby on July 29, 2022. He was being sent to Ohio State Penitentiary. There was a Special Response Team brought to his cell in segregation. He was told he could take whatever was in that cell and would be leaving immediately.

32. There was no hearing regarding the movement to OSP. There was no hearing regarding the alleged assault of Rodriguez. He was taken in a van to OSP.

33. He was then again transferred to the Southern Ohio Correctional Facility. Plaintiff was given a RIB hearing once he was at OSP in Lucasville, Ohio.

## LEGAL CONCEPTS

### Section 1983

34. Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges or immunities secured by the Constitution or laws of the United States. *42 U.S.C. § 1983*. This section does not create any new substantive rights, but it provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere. *Baker v. McCollan, 443 U.S. 137, 144 n.3, 61 L. Ed. 2d 433, 99 S. Ct. 2689 (1979)*.

35. Constitutional violations under section 1983 are a species of tort liability. *See Carey v. Piphus, 435 U.S. 247, 253-55, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978); City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 727, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999) (Scalia, J., concurring in part)*. Tort law measures causation by reference to two standards: proximate and but-for cause. "Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct." *Paroline v. United States, 572 U.S. 434, 445, 134 S. Ct. 1710, 188 L. Ed. 2d 714 (2014)*. It precludes liability only "where the casual link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *Id.* But-for causation, instead, exists where the alleged injury or result would not have occurred "but for" that conduct. *White v. Roper, 901 F.2d 1501, 1505-06 (9th Cir. 1990)*.

36. For liability against a supervisor, "liability must be based on more than respondent superior." *Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)*. "Nor

can liability of supervisors be based solely on the right to control employees" or "simple awareness of employees' misconduct." *McQueen v. Beecher Cmty. Schs., 433 F.3d 460, 470 (6th Cir. 2006) (internal citations omitted)*. Rather, "a supervisory official's failure to supervise, control, or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident or misconduct or in some other way directly participated in it.'" Id. (quoting *Shehee, 199 F.3d at 300*). "At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee, 199 F.3d at 300*. "A mere failure to act will not suffice to establish supervisory liability." *Gregory v. City of Louisville, 444 F.3d 725, 751 (6th Cir. 2006)*. Therefore, personal liability against a supervisor "under § 1983 must be based on active unconstitutional behavior." *Shehee, 199 F.3d at 300*.

## FIRST CLAIM:

### DEFENDANTS ENGAGED IN A PATTERN OF RETALIATION AGAINST THE PLAINTIFF'S FIRST AMENDMENT RIGHTS TO EMPLOY THE GREIVANCE PROCESS IN THE OHIO DEPARTMENT OF CORRECTIONS AND REHABILIATION

37. Plaintiff incorporates paragraphs 1-33 in this claim.

38. Plaintiff has a protected right to freedom of expression. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)*. To set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that

would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Thaddeus-X, 175 F.3d at 394*. Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977))*.

39. The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith v. Campbell, 250 F.3d 1032, 1037 (6th Cir. 2001); Hall v. Nusholtz, No. 99-2442, 2000 U.S. App. LEXIS 28002, 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); Burton v. Rowley, No. 00-1144, 2000 U.S. App. LEXIS 28000, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000)*.

40. Plaintiff was ordered to be transferred from NEOCC to the Ohio State Penitentiary on July 29, 2022. He was moved immediately without any fair warning. This was in close relation to his refusing to retrieve the firearm and threatening to file a grievance. This was also in close relation to his brother contacting the Ohio State Highway Patrol, who is directly responsible for investigating crimes in prison.

41. Plaintiff was engaging in protected first amendment conduct, i.e., wanting to file a grievance against the administration. The defendants transferred him to OSP. This move was obviously motivated by his threatening to expose how NEOCC

13

was run. Once at SOCF he initiated a grievance regarding this unlawful operation of NEOCC. At that point he had been transferred twice. Without hearing.

42. Ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow, 412 F.3d 693, 701 (6th Cir. 2005). See, e.g., Smith v. Yarrow, 78 F. App'x. 529, 543 (6th Cir. 2003)* "transfer from one prison to another prison cannot rise to the level of an adverse action because it would not deter a person of ordinary firmness from the exercise of his First Amendment rights") (internal quotation marks omitted). If, however, a foreseeable consequence of a transfer would be to substantially inhibit a prisoner's ability to access the courts, then such a transfer could be considered an "adverse action" that would deter a person of ordinary firmness from continuing to engage in the protected conduct. *See Siggers-El, 412 F.3d at 702* (holding that a transfer was an "adverse action," where the transfer resulted in plaintiff losing a high paying job that paid for his lawyer fees and moved him further from the attorney); *Johnson v. Beardslee, No. 1:06-CV-374, 2007 U.S. Dist. LEXIS 57813, 2007 WL 2302378, at *5 (W.D. Mich. Aug. 8, 2007)*. Similarly, the Sixth Circuit has held that a transfer to segregation or to an area of the prison used to house mentally disturbed inmates could be sufficiently adverse. See Thaddeus-X, 175 F.3d at 398; see also Hill v. Lappin, 630 F.3d at 474. This illegal transfer so close in time to Plaintiff's refusal to retrieve the firearm and when he threatened to file a grievance shows clear retaliation.

43. All the Defendants assisted in the transfer of the Plaintiff from NEOCC to SOCF. The warden would have to institute the request, the director would have to sign

off, the deputy warden would have to order guards ( what few there are at NEOCC) to pack up and put Plaintiff on the bus.

44. This claim was properly litigated using the prison grievance system and in accordance with PLRA. There was a grievance filed according to ODRC regulations and appealed.

## SECOND CLAIM:

### DEFENDANTS VIOLATED PLAINTIFF'S RIGHT TO PROCEDURAL DUE PROCESS BY FAILING TO GIVE HIM WRITTEN NOTICE AND A HEARING PRIOR TO HIS BEING TRANSFERRED TO THE OHIO STATE PENITENTIARY

45. Institutional transfers generally do not implicate a liberty interest. *See Workman v. Wilkinson, 23 F. App'x 439, 440 (6th Cir. 2001) (citing Meachum v. Fano, 427 U.S. 215, 224-25, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976))* ("Even in the absence of a disciplinary conviction, a state may transfer a prisoner to a less desirable facility without implicating the Due Process Clause.")); *Wilkinson v. Austin, 545 U.S. at 221 (citing Meachum, 427 U.S. at 225)* ("the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."); *Moody, 429 U.S. at 88 n.9* ("no due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a 'grievous loss' upon the inmate."). There is one notable exception: an inmate's transfer to Ohio State Penitentiary, Ohio's "supermax" prison, does impose an atypical and significant hardship, given the combination of extreme isolation of inmates, prohibition of almost all human contact, indefinite duration of assignment, and disqualification

15

for parole consideration of otherwise eligible inmates. *See Wilkinson v. Austin, 545 U.S. at 223-24.*

46. The Supreme Court mandates a two-step analysis for procedural due-process claims: "We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so, we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke, 131 S. Ct. 859, 861, 178 L. Ed. 2d 732 (2011).*

47. ODRC Policy provides that an inmate must receive notice of the factual basis leading to consideration for OSP placement and a fair opportunity for rebuttal. Procedural due process cases have consistently observed that these are among the most important procedural mechanisms for purposes of avoiding erroneous deprivations. *See Greenholtz v. Inmates of Neb. Penal and Correctional Complex, 442 U.S. 1, 15, 60 L. Ed. 2d 668, 99 S. Ct. 2100 (1979); Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 543, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985); Fuentes v. Shevin, 407 U.S. 67, 80, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972)* ("For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified'" (quoting *Baldwin v. Hale, 68 U.S. 223, 1 Wall. 223, 233, 17 L. Ed. 531 (1864)*)))

48. No written notice was given. No hearing occurred. The warden just decided he would transfer him to OSP. Without warning and within ten minutes of being told. This constitutes a violation.

49. All the Defendants assisted in the transfer of the Plaintiff from NEOCC to SOCF. The warden would have to institute the request, the director would have to sign off, the deputy warden would have to order guards ( what few there are at NEOCC) to pack up and put Plaintiff on the bus.

50. This claim was properly litigated using the prison grievance system and in accordance with PLRA. There was a grievance filed according to ODRC regulations and appealed.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all claims contained in this complaint.

## PRAYER FOR RELIEF

Plaintiff prays for the following relief:

A. Damages more than seventy-five thousand dollars as determined by a jury.

B. Reasonable attorney's fees

## VERIFICATION OF COMPLAINT

I, Yusuf Brown-Austin declare as follows:

1. I am a party to this action.

2. I have read the foregoing complaint and know of the contents thereof.

3. Based on my own knowledge, the contents of paragraphs 1-50 are true and accurate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/s/ Yusuf Brown-Austin*
Yusuf Brown-Austin

NOTARY CERITIFCATION

I hereby swear and affirm that Plaintiff appeared before me, was sworn and declared the above was true and accurate the best of his knowledge and understanding.

Notary public
07-14-2023

LISA E REUTER
Notary Public
In and for the State of Ohio
My Commission Expires
April 30, 2027

Respectfully submitted,

**S/ Eric J Allen**

_____
ERIC J ALLEN    (0073384)
The Law Office of Eric J Allen, LTD
4200 Regent, Suite 200
Columbus, Ohio 43219
Tele No. 614.443.4840
Fax No. 614.573.2924
Email:eric@eallenlaw.com